STATE OF NORTH CAROLINA v. ELLA HENRIETTA ROBERTS WOODS

No. 7614SC935

(Filed 18 May 1977)

1. **Criminal Law § 90— State's impeachment of own witnesses**

   The trial court erred in permitting the private prosecutor to impeach two State's witnesses by asking questions about prior inconsistent statements made by the witnesses at a preliminary hearing where the prosecutor made no showing that the State was misled or surprised by testimony contrary to what the State had a right to expect, and the trial judge made no ruling defining the scope of the impeachment.

2. **Homicide § 27.1— confusing instructions on manslaughter**

   Trial court's instructions on voluntary manslaughter which followed suggested instructions in the N. C. Pattern Jury Instructions for Criminal Cases were confusing.

APPEAL by defendant from *Lee, Judge.* Judgment entered 18 June 1976 in Superior Court, DURHAM County. Heard in the Court of Appeals 13 April 1977.

Defendant was tried upon a charge of second degree murder arising from the fatal shooting of her husband on 3 March 1976. The jury found her guilty of voluntary manslaughter, and judgment of imprisonment was entered.

*Attorney General Edmisten, by Special Deputy Attorney General John R. B. Matthis and Associate Attorney Alan S. Hirsch, for the State.*

*Chambers, Stein, Ferguson & Becton, by Charles L. Becton, for the defendant.*

BROCK, Chief Judge.

On 2 March 1976 the deceased, R. B. Woods, and his wife, the defendant, Ella Woods, lived in their home in Durham County with five children born of the marriage. A family meeting was arranged for the night of 2 March 1976 to discuss family business. The discussion developed into a heated argument with cursing and threats between the deceased and the children. Finally fighting erupted between the deceased and two of the children, and the meeting culminated in the fatal shooting of deceased by defendant.

The children of defendant were the only eyewitnesses to what transpired before and immediately after the shooting. Two of the children, David Woods and Carolyn Woods, were called as witnesses by the State at the preliminary hearing and at the trial. At the preliminary hearing and at the trial the State's evidence and argument to the jury were presented by a privately employed prosecuting attorney.

[1]  In presenting the testimony of David Woods, the private prosecutor asked questions, over objection, which tended to cross-examine the witness and impeach his testimony. In presenting the testimony of Carolyn Woods, the private prosecutor asked questions, over objection, which cross-examined the witness and tended to impeach her testimony. Much of the cross-examination of Carolyn Woods by the private prosecutor, to which objections were overruled, concerned her prior inconsistent statements at the preliminary hearing.

Much of the private prosecutor's argument to the jury, to which objections were overruled, was impeachment of the State's witnesses. An example of the private prosecutor's argument to the jury concerning the testimony of the State's witness David Woods is as follows:

"Now, why would a young man 14 years old say something like that and then come in this courtroom and directly reverse himself? Why would he do that unless there is some-

thing to hide? No reason to tell something that is not true, if you have nothing to hide, but he did this, and so did his sister, 18 year old Carolyn."

An example of the private prosecutor's argument to the jury, to which objections were overruled, concerning the testimony of the State's witness Carolyn Woods is as follows:

"Now, I asked her again, or words to that effect, 'Was there any fighting or fussing going on, fighting after the first shot was fired.' She said 'Yes,' her father was still attacking her mother and doing that and doing this. I said 'Well, let me ask you what you testified to on March 23,' and I read it to her. Question, 'Was he fighting after the first shot was fired?' Answer: 'No.'"

Assuming without deciding that such arguments would be permissible had the impeaching cross-examinations been proper, permitting such argument following improperly permitted impeaching cross-examinations only served to compound the error of the improper cross-examination.

In the recent case of *State v. Pope*, 287 N.C. 505, 215 S.E. 2d 139 (1975), Chief Justice Sharp discussed the generally recognized exception or corollary to the anti-impeachment rule, that is, the corollary which allows impeachment where the party calling the witness has been misled and surprised or entrapped to his prejudice. Because of the applicability of that discussion to the situation presented by this case, we quote liberally from it:

"Our decisions, in holding that the State cannot impeach its own witness, also hold that the State is not bound by what the witness says. The State's attorney, therefore, may show by other witnesses or other competent evidence that the facts are different from those to which the witness has testified. The trial judge also has the discretionary power to permit a prosecuting attorney who has been surprised by the testimony of an evasive or hostile witness to call his attention to his prior inconsistent statements for the purpose of 'refreshing his memory' or 'awakening his conscience.' (Citations omitted.)

"In a situation where the witness has treacherously induced the State to call him by representing that he will give testimony favorable to its contentions and then sur-

prises the solicitor with testimony contra, cross-examination is not likely either to 'refresh his memory' or 'awaken his conscience.' In such instances the reason for the corollary to the anti-impeachment rule is demonstrated: 'It would be grossly unfair to permit a witness to entrap a party into calling him by making a statement favorable to that party's contention, and then, when he is called and accredited by that party and gives testimony at variance with his previous statement and against that party's interest, to deny the party calling him the right to show that he was induced to do so by a previous statement of the witness made under such circumstances as to warrant a reasonable belief that the witness would repeat the statement when called to testify.' (Citations omitted.)

"Surprise or entrapment, however, will not automatically invoke the anti-impeachment corollary. The State's motion to be allowed to impeach its own witness by proof of his prior inconsistent statements is addressed to the sound discretion of the trial court. The motion should be made as soon as the prosecuting attorney is surprised. He may not wait until subsequent 'surprises' follow. Further, surprise does not mean mere disappointment; it means 'taken (captured) unawares.' (Citation omitted.)

"Before granting the motion the court must be satisfied that the State's attorney has been misled and surprised by the witness, whose testimony as to a material fact is contrary to what the State had a *right* to expect. These preliminary questions are determined by the court upon a *voir dire* hearing in the absence of the jury in the manner in which the admissibility of a confession is ascertained after objection. If the trial judge finds that the State should be allowed to offer prior inconsistent statements, his findings should also specify the extent to which such statements may be offered. (Citations omitted.)

"The right to prove prior oral inconsistent statements is limited to statements made by the witness to the State's attorney or to some person whom he specifically instructed to communicate the statement to the attorney. (Citations omitted.) However, where investigating officers, whose duty it is to seek, find, preserve and analyze evidence of criminal offenses and turn it over to the prosecuting attor-

ney for ultimate legal action, have furnished him with formally prepared, signed or acknowledged statements of witnesses, he may rely on these statements unless he possesses other information which reasonably apprises him that they were false or that the witness making them intends to repudiate them. (Citations omitted.)

"While the cases cited in the preceding paragraph hold that the State's attorney can legitimately claim surprise in the instances above specified albeit he himself does not interview the witness before calling him to the stand, in our view the better practice, and the only safe rule, is 'never to call a witness to whom you have not talked.'

"Where the prosecuting attorney knows at the time the witness is called that he has retracted or disavowed his statement, or has reason to believe that he will do so if called upon to testify, he will not be permitted to impeach the witness. He must first show that he has been genuinely 'surprised or taken unawares' by testimony which differed in material respects from the witness's prior statements, which he had no reason to assume the witness would repudiate. (Citations omitted.)

"Testimony tending to show a witness's prior inconsistent statements is admitted only to show that the State was surprised by his testimony and to explain why the witness was called. Such statements 'are not probative evidence on the merits and are not to be treated as having any substantive or independent testimonial value.' (Citation omitted.) Their only effect is to impeach the credibility of the witness. (Citations omitted.)" *Id.* at 512-14, 215 S.E. 2d at 144-46.

The private prosecutor in the present case did not seek permission to impeach his witnesses with their prior inconsistent statements. The private prosecutor made no showing that the State was in fact misled and surprised by testimony contrary to what the State *had a right* to expect. There was no *voir dire* hearing upon the question, and the trial judge made no ruling defining the scope of the impeachment. In short, the justification for invoking the exception or corollary to the anti-impeachment rule was not demonstrated or found to exist. This improper impeachment by the State of its own witnesses constituted prejudicial error entitling defendant to a new trial.

**[2]**   Defendant also assigns error to several portions of the trial judge's instructions to the jury. While we might suggest that these asserted errors are not likely to reoccur on a new trial, we feel it appropriate to make some brief observation. One of the challenged portions of the instructions is as follows:

> "If you do not find the defendant guilty of second degree murder you must then consider whether or not she is guilty of voluntary manslaughter. If you find from the evidence and beyond a reasonable doubt that on or about March third, 1976, the defendant Ella Woods intentionally and while not acting in her own proper self defense or in the proper self defense of her children David and Carolyn, shot R. B. Woods with a deadly weapon, a 32 caliber pistol, thereby proximately causing the death of R. B. Woods, if you find all of that beyond a reasonable doubt, *but the State has failed to satisfy you beyond a reasonable doubt that the defendant Ella Woods killed with malice because of heat of sudden passion aroused by adequate provocation, or if the State has failed to satisfy you that she was the aggressor without murderous intent in bringing on the dispute, or if the State has failed to satisfy you that although exercising the right of self defense that she used excessive force, it would be your duty to return a verdict of guilty of voluntary manslaughter.*" (Emphasis added.)

It seems reasonable to suggest that the foregoing language tends towards confusion. It was our original thought that error in the transcription of the charge may have distorted the spoken words. Nevertheless, when compared with the third paragraph of N. C. Pattern Jury Instructions for Criminal Cases, § 206.10, page 10, we find that the trial judge followed almost verbatim the suggested instruction. It appears that § 206.10 was extensively rewritten and distributed as "Replacement June 1976" in an effort to conform the instructions with the holding in *Mullaney v. Wilbur*, 421 U.S. 684, 44 L.Ed. 2d 508, 95 S.Ct. 1881 (1975). We recommend further study of § 206.10 for the purpose of clarifying the instructions quoted above and others of similar import contained in that same section. We suggest only that the present composition of the instructions undertakes to place more alternatives in one sentence than is desirable and also, that a more positive and a less negative approach can be taken to an explanation of the effects of the varying circumstances.

Because of the violation of the anti-impeachment rule, defendant is entitled to a

New trial.

Judges VAUGHN and CLARK concur.